**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Jerrold Ryan Kemmer,

Plaintiff,

v.

Beltrami County/Beltrami County Sheriff's Department, Randy Fitzgerald, individually and in his capacity as Deputy of the Beltrami County Sheriff's Department, and Ernie Beitel, individually and in his capacity as Deputy of the Beltrami County Sheriff's Department,

Defendants.

**MEMORANDUM OPINION AND ORDER**
Civil No. 01-403 ADM/RLE

---

Joni M. Thome, Esq., Thome Law Office, Minneapolis, Minnesota, appeared for and on behalf of the Plaintiff.

Ann R. Goering, Esq., and Erin K. Munson, Esq., Ratwik, Roszak & Maloney, P.A., Minneapolis, Minnesota, appeared for and on behalf of the Defendants.

---

## I. INTRODUCTION

On March 20, 2002, the undersigned United States District Judge heard the Motion for Summary Judgment [Doc. No. 13] by Defendants Beltrami County/Beltrami County Sheriff's Department ("Beltrami County"), Deputy Randy Fitzgerald ("Fitzgerald") and Deputy Ernie Beitel ("Beitel"). Defendants seek summary judgment on many claims alleged by Plaintiff Jerrold Ryan Kemmer ("Kemmer"). For the reasons set forth below, Defendants' Motion is granted in part and the remaining state law claims are remanded to state court.

FILED JUN 17 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. BACKGROUND

This case presents allegations seemingly tailored more for a made-for-TV movie, than litigation. Kemmer, born October 25, 1979, is a young man of "slight build." Pl. Mem., at 2; *see* Pl. Dep., at 3. He openly identifies as a homosexual. *Id.* Kemmer has a history of involvement with law enforcement officials around Beltrami County, Minnesota. Over the years, he has been convicted of impersonating a police officer, sodomy, driving with suspended license, and writing worthless checks. *See* Pl. Dep., at 104, 115-16, 147-48, 199, 286-87. Kemmer can identify no specific instance in which he was falsely arrested. *See id.*, at 172-74, 198-99. Some of Kemmer's contacts with law enforcement are relevant here, and a summary of those incidents follows.

On July 18, 1996, Deputies Beitel and Fitzgerald were called to a disturbance at a house in the neighborhood of Kemmer's residence[1] in Bemidji, Minnesota. *See* Beitel Aff. ¶ 5; Fitzgerald Aff. ¶ 3. Upon arriving, the Deputies instructed Kemmer to leave the house and he complied. Someone at the house informed the Deputies that Kemmer had been dressing like a police officer, identifying himself as a police officer, and possessing police equipment. *See* Beitel Aff. ¶¶ 5-7; Fitzgerald Aff. ¶¶ 3-4. Deputies Beitel and Fitzgerald report that they later attempted to locate Kemmer, but to no avail. *See* Beitel Aff. ¶¶ 5-7; Fitzgerald Aff. ¶¶ 3-4.

Kemmer alleges, however, that Deputy Beitel found him later that night at his home and asked him questions regarding the earlier disturbance. *See* Pl. Dep., at 76-85. While they were seated in a squad car parked in front of Kemmer's residence, Kemmer alleges Beitel stated that

---

[1] During the relevant time, Kemmer was living with his mother.

he had enough information to arrest Kemmer for impersonating a police officer and take him to jail. *Id.* at 78. Beitel allegedly told Kemmer there were "two ways out of this . . . one, I can take you to jail for impersonating a police officer right now, or you can give me a blowjob." *Id.* at 82. After a few minutes passed, Beitel allegedly asked, "what's it going to be?" *Id.* at 83. Kemmer alleges he performed oral sex on Beitel for approximately eight to ten minutes. *Id.* at 84. Thereafter, Beitel allegedly warned Kemmer not to tell anyone about what had happened and said he was not charging Kemmer with any crime. *Id.* at 84-85.

On July 13, 1997, the Beltrami County dispatcher received a call from Kemmer, reporting that some kids were following and harassing him at Kelliher, Minnesota. *See* Beitel Aff. ¶ 9; Pl. Dep., at 94. The dispatcher explained to Kemmer that the nearest deputy was at Bemidji, Minnesota. *See* Beitel Aff. ¶ 9. On Kemmer's suggestion, the dispatcher directed the deputy to meet Kemmer at the "Food & Fuel" station in Blackduck, Minnesota, located between Bemidji and Kelliher. *Id.* Deputy Beitel was the available deputy at Bemidji, and he proceeded to Blackduck, arriving at 4:18 a.m. *Id.* ¶¶ 9-10. Deputy Beitel spoke with Kemmer for a few minutes, determined he did not need law enforcement assistance, and reported to dispatch he was leaving the scene at 4:20 a.m. *Id.* ¶ 10.

Kemmer alleges Beitel asked him to sit in his squad car and said, "the night does not have to be a total waste." Pl. Dep., at 95. Kemmer alleges Beitel offered, "if you do what you did last time, I'll let you drive the squad car for a little while." *Id.* Kemmer wanted to drive the squad car. *Id.* at 95, 99-100. He allegedly performed oral sex on Beitel for about ten minutes. *Id.* at 96. Thereafter, Kemmer alleges Beitel allowed him to drive the squad car, and even allowed Kemmer to activate the lights & sirens in order to stop someone for a tail-light violation. *Id.* at

97-98.

In the late night hours of August 12, 1998, Deputy Fitzgerald received a call from the Beltrami County dispatcher, informing him that someone had reported Kemmer was out identifying himself as a police officer. *See* Fitzgerald Aff. ¶ 5. Deputy Fitzgerald pulled Kemmer over and found him wearing a long-sleeved uniform shirt with American Flag patches. *Id.* Deputy Fitzgerald asked Kemmer about the impersonating a police officer allegations, and Kemmer denied them. *Id.* Kemmer alleges that Deputy Fitzgerald terrorized him with a police dog. *See* Pl. Dep., at 112. Deputy Fitzgerald denies this allegation. Deputies Rankin and Beitel also responded to the scene. *See* Fitzgerald Aff. ¶ 6; Beitel Aff. ¶ 11. Pursuant to a request by the Beltrami County Attorney, the Deputies arrested Kemmer and took him into custody. Fitzgerald Aff. ¶ 7; Beitel Aff. ¶ 11. Kemmer alleges that the Deputies caused him to hit his head on the door of the squad car, but concedes that this bump did not require medical attention. *See* Pl. Dep., at 114.

Kemmer alleges that Beitel later visited him in his jail cell, and told Kemmer if he gave Beitel a "blowjob, he would see what he could do about getting [Kemmer] out of [jail]." Pl. Dep., at 124. Kemmer alleges he performed oral sex on Beitel until a door "clinked," and then Beitel quickly left Kemmer's cell. *Id.* at 125. Deputy Beitel denies visiting Kemmer in the jail as well as ever engaging in any kind of sexual contact with Kemmer. Beitel Aff. ¶¶ 13, 17.

The drama intensified when on February 6, 2000, Deputy Fitzgerald was alerted by the dispatcher to two citizens' complaints regarding Kemmer. *See* Fitzgerald Aff. ¶ 9. One caller

complained Kemmer was very intoxicated and had threatened him.[2] *Id.* The second caller reported that Kemmer brushed bumpers with his car, threatened him and was carrying mace. *Id.* Deputy Fitzgerald drove to Kelliher, Minnesota, to investigate and locate Kemmer. *Id.*

After arriving in Kelliher, Deputy Fitzgerald identified a vehicle matching the description of Kemmer's car, pulled behind and followed. Fitzgerald Aff. ¶ 10. As Deputy Fitzgerald was running a check on Kemmer's license plates, Kemmer accelerated at a high rate of speed northbound on Highway 72 out of Kelliher. *Id.*

Deputy Fitzgerald activated his lights & sirens and pursued Kemmer's speeding car. *Id.* ¶ 11. Kemmer did not stop. Even as the police chase reached speeds of 115 miles per hour, Kemmer smoked cigarettes and continued to drink his vodka and Diet Mountain Dew concoction. Pl. Dep., at 25. The high-speed chase ran from Kelliher to Baudette, Minnesota, a distance of approximately 60 miles. Fitzgerald Aff. ¶ 11.

Deputy Fitzgerald called for backup. *Id.* ¶ 14. Deputy Bill Atwater responded. As they neared the county line, Deputy Kirk Haugen from Lake of the Woods County also responded and joined the hot pursuit. *Id.* Kemmer drove at speeds exceeding 100 miles per hour followed by three police vehicles with their lights & sirens running. Near Baudette, the long stretch of Highway 72 ends in a T-intersection. At this intersection, Baudette police officers erected a road block using a logging truck. *Id.* ¶ 16. When Kemmer approached the road block, he slowed down and somehow squeezed his car between the police car and the logging truck. *Id.* Kemmer

---

[2] At his deposition, Kemmer admitted that on the evening of February 6, 2000, he drank about eight vodka and Diet Mountain Dew cocktails. Pl. Dep., at 23. He was underage at the time.

sped on down Highway 11 toward Baudette. *Id.*

As Kemmer approached Baudette, he abruptly stopped and attempted to turn around. Fitzgerald Aff. ¶ 17. This sudden change of direction caused a collision with Deputy Haugen's squad car and the two cars came to a stop side by side. *Id.*; Haugen Aff. ¶ 6. Deputy Fitzgerald positioned his vehicle in front of Kemmer's car and Deputy Atwater pulled his car alongside Kemmer's car. By this arrangement, the Deputies had Kemmer's car surrounded on three sides, but not to the rear.

Deputy Haugen attempted to open Kemmer's door, but it was locked. Kemmer persistently refused instructions to open it. Haugen Aff. ¶ 7. While standing on the hood of the car, Deputy Fitzgerald kicked and broke Kemmer's windshield "to distract [Kemmer] so he wouldn't back up, and to cloud his visibility in the event he tried to back away." Fitzgerald Aff. ¶ 18. Kemmer then unlocked his door and Deputy Haugen pulled him from the car and onto the ground. Haugen Aff. ¶ 7. Kemmer refused instructions to put one of his hands behind his back and was resisting by kicking his legs. Concerned that the uncuffed-hand was carrying the bottle of mace identified by complaints to the dispatcher, Deputy Fitzgerald employed a technique taught in law enforcement training: "When you control the head, you control the body." Fitzgerald Aff. ¶ 19. Deputy Fitzgerald applied the weight of his knee to Kemmer's head. Then Kemmer pulled his hand from underneath his body and allowed Deputy Haugen to cuff him. *Id.*

Kemmer alleges Deputy Fitzgerald hit him on the left side of his face and kicked him in the ribs during this arrest. Pl. Dep., at 35-37. All officers at the scene dispute this allegation. *See* Fitzgerald Aff. ¶ 20; Haugen Aff. ¶ 10; Halverson Aff. ¶ 7. Lake of the Woods Sheriff, Jim Paulseth, took a statement from Kemmer regarding the incident and his allegations of

wrongdoing by Beltrami County Deputies. Pl. Dep., at 43-45. Kemmer was transported to the Beltrami County jail. On February 8, 2000, the Beltrami County Sheriff, Keith Winger, and Deputy Brian Ball interviewed Kemmer regarding his complaints. In a letter of March 8, 2000, Sheriff Winger informed Kemmer that he had investigated his complaints and found Kemmer's allegations to be unsubstantiated. Thome Aff. Ex. D.

On February 5, 2001, Kemmer commenced this action in state district court of Beltrami County, Minnesota. On March 5, it was removed to United States District Court.

## III. DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Plaintiff Kemmer concedes that his claims for False Imprisonment, False Arrest, Battery, Malicious Prosecution, Sexual Harassment, and Sex Discrimination, are all barred by the applicable statute of limitations or are unsupported by the evidence and thus should be dismissed against all defendants. *See* Pl. Mem. in Opp'n., at 14-15, 27. Summary judgment on these claims is granted. The disputed remaining claims will be addressed here.

### A. Excessive Use of Force

Kemmer argues that Defendants used an excessive amount of force when arresting him at the conclusion of the high-speed chase. The "objective reasonableness" of a particular use of

force must be judged from the perspective of a reasonable officer on the scene. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). The question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Id.*; *Winters v. Adams*, 254 F.3d 758, 765 (8th Cir. 2001). Courts should not indulge in "armchair quarterbacking" or exploit the benefits of hindsight when evaluating police officers' use of force. *Gardner v. Buerger*, 82 F.3d 248, 251 (8th Cir. 1996). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. These Fourth Amendment principles must be applied to Kemmer's allegations.

Following the 60-mile pursuit at speeds exceeding 100 miles per hour, Kemmer's car was finally stopped. The Deputies had Kemmer's car surrounded on only three sides, leaving Kemmer as escape route if he reversed his car. Kemmer refused Deputy Haugen's orders to unlock his car door. Deputy Fitzgerald made a split-second judgment, in a tense and uncertain moment, to break Kemmer's windshield in order to prevent or at least impede Kemmer's escape. During Kemmer's resistance to being handcuffed, the officers did not know if he held anything in the hand hidden underneath his body. It had been reported that Kemmer was carrying mace that night. Deputy Fitzgerald made a decision to place his knee on Kemmer's head, controlling his movements so that Kemmer would free his hand to be cuffed. These decisions were "objectively reasonable" from the perspective of a reasonable officer on the scene and do not rise the level of an excessive amount of force. In a situation where the deputies are absolved of

liability, the County cannot be held liable for their actions. *See Veneklase v. City of Fargo,* 248 F.3d 738, 748 (8th Cir. 2001) (en banc); *see also Olinger v. Larson,* 134 F.3d 1362, 1367 (8th Cir. 1998) ("The City cannot be liable . . . whether on a failure to train theory or a municipal custom or policy theory, unless [an officer] is found liable on the underlying substantive claim."). Summary judgment is granted on Kemmer's excessive force claims.

**B. § 1983 Claim**

Kemmer alleges that Beltrami County had a custom or practice of violating his constitutional rights. Kemmer may establish the County's liability under § 1983 by proving that his constitutional rights were violated by an "action pursuant to official [County] policy" or misconduct so pervasive among non-policymaking employees of the County "as to constitute a 'custom or usage' with the force of law." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978) (internal quotation omitted); *see also McGautha v. Jackson County,* 36 F.3d 53, 55-57 (8th Cir. 1994). There is no evidence the County had an official policy that violated Kemmer's rights. To establish a "custom or usage," Kemmer must demonstrate: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the County's employees; (2) deliberate indifference to or tacit authorization of such conduct by the County's policymaking officials after notice to the officials of that misconduct; and (3) his injury by acts pursuant to the County's custom, *i.e.*, evidence that the custom caused the constitutional violation. *Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir. 1998).

Kemmer is required to show that County officials had notice of prior incidents of police misconduct and deliberately failed to act on this knowledge. *Harris v. City of Pagedale*, 821

F.2d 499, 504 (8th Cir. 1987). Kemmer may not rest upon mere allegations or denials, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). As evidence of notice, Kemmer testified that he told his probation officer, a state employee, about his allegations regarding the Beltrami County Deputies. Notice to an employee of the State of Minnesota does not constitute notice to Beltrami County. Kemmer fails to present sufficient evidence to meet his burden of showing that the County had notice of a pattern of unconstitutional misconduct by the County's Deputies. After the County received notice of Kemmer's allegations following the chase in February, 2000, Sheriff Winger investigated those allegations. There is no evidence of additional incidents after the notice to the County. Absent evidence indicating notice and a deliberate failure to act on such knowledge, summary judgment is appropriate on Kemmer's § 1983 claim.

**C. Sexual Abuse**

Kemmer alleges claims for sexual abuse resulting from acts constituting criminal sexual conduct in violation of Minn. Stat. § 609.344. A six-year statute of limitations applies to claims for damages based on personal injury caused by sexual abuse. Minn. Stat. § 541.073, subd. 2. This six-year limitations period applies if Kemmer was less than 18 years of age at the time of the alleged sexual abuse. *See* Minn. Stat. § 609.344, subd. 1(e). Kemmer turned 18 on October 25, 1997. Thus, Kemmer's alleged incidents of sexual abuse occurring before that date fall within the six-year statute of limitations and are timely.

Two allegations in this case qualify for the six-year statute of limitations. Kemmer alleges that on July 18, 1996, Beitel asked for a "blowjob" in exchange for not taking Kemmer to

jail that night. Kemmer further alleges that on July 13, 1997, Beitel offered to let Kemmer drive his squad car in exchange for a "blowjob." These allegations are not barred as untimely.

Defendants argue Beitel's alleged interactions with Kemmer do not rise to the level of criminal sexual conduct actionable as sexual abuse because Kemmer consented to the acts and Beitel was not in a "position of authority" over Kemmer. For purposes of sexual abuse, Minnesota law defines a "position of authority" as:

> includ[ing] but . . . not limited to any person who is a parent or acting in the place of a parent and charged with any of a parent's rights, duties or responsibilities to a child, or a person who is charged with any duty or responsibility for the health, welfare, or supervision of a child, either independently or through another, no matter how brief, at the time of the act.

Minn. Stat. § 609.341, subd. 10. "This definition does not contain an exclusive list of persons in a position of authority." *State v. Larson*, 520 N.W.2d 456, 461 (Minn. App. 1994).

Using the language "includes but is not limited to," the Minnesota Legislature intended the statute to have broad application to deal with the special problems involved in child abuse cases. *See State v. Willette*, 421 N.W.2d 342, 345 (Minn. App. 1988) (stating that "'person in a position of authority' is broadly defined"). The statute provides that a person who has "*any duty or responsibility*" for the "*welfare*" of a child "*no matter how brief*" is considered to be in a "position of authority." Minn. Stat. § 609.341, subd. 10 (emphasis added). Even for a brief time, a police officer may undertake a duty and responsibility for the welfare[3] of a youth. Thus, a police officer who brings a young person under 18 years old into his patrol car pursuant to police

---

[3] States exercise their police power for the protection of the public health, welfare, and morals. *See Abeln v. City of Shakopee*, 28 N.W.2d 642, 645 (Minn. 1947) (citing *Bartemeyer v. State of Iowa*, 85 U.S. 129 (1873)).

business may be considered to be in a "position of authority" over that youth for purposes of Minn. Stat. § 609.344, subd. 1(e).

On both occasions of claimed sexual contact, Deputy Beitel allegedly asked Kemmer to sit in his squad car pursuant to an investigation of potential criminal activity. Under the circumstances, Deputy Beitel had a duty for Kemmer's welfare, such that Beitel was in a "position of authority" for purposes of Minnesota's sexual abuse statute. Kemmer has presented sufficient evidence creating a genuine issue of material fact with regard to his sexual abuse claims. Defendant Beitel's motion for summary judgment on the sexual abuse claims is denied.

However, summary judgment is granted for Defendant Beltrami County to the extent Kemmer alleges a respondeat superior theory of liability on this claim. The acts alleged to have been committed by Beitel fall outside the scope of his employment as a deputy sheriff for Beltrami County. As discussed above, the County had no notice of Kemmer's allegations until February, 2000. The County may not be held liable for Beitel's acts outside the scope of his employment which are not foreseeable. *See P.L. v. Aubert*, 545 N.W.2d 666, 668 (Minn. 1996).

**D. Sexual Orientation Hostile Environment Harassment under Minn. Stat. § 363.03**

Kemmer alleges sexual orientation hostile environment harassment in violation of Minn. Stat. § 363.03, Subd. 4. Claims of unfair discriminatory practices must be brought as a civil action "within one year after the occurrence of the practice." Minn. Stat. § 363.06, Subd. 3. The only incident within the statute of limitations period is the high-speed chase on February 6, 2000. All other allegations in Kemmer's Complaint or deposition are beyond the statute of limitations period. Kemmer has presented no evidence that his arrest subsequent to the 60-mile pursuit was

harassing or unlawfully discriminatory. Kemmer lacks sufficient evidence upon which a jury could reasonably find in his favor on his claim of sexual orientation hostile environment harassment. *See Anderson*, 477 U.S. at 252. Summary judgment is granted.

**E. Remand**

Kemmer's remaining claims against Beitel for personal injuries caused by sexual abuse in violation of Minn. Stat. § 609.344 are governed by Minnesota law. This Court does not have federal question jurisdiction over state law claims. Diversity jurisdiction does not exist here because both parties are citizens of Minnesota. Although supplemental jurisdiction over related state law claims may exist if there is one claim over which the district court has original jurisdiction, 28 U.S.C. § 1367(c), a district court has discretion to reject supplemental jurisdiction over state law claims where the court has already "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Eighth Circuit cautioned that federal courts should "exercise judicial restraint and avoid state law issues wherever possible." *Thomas v. Dickel*, 213 F.3d 1023, 1026 (8th Cir. 2000) (citing *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990)); *see* 28 U.S.C.A. § 1367 cmt. at 835 (1993). "[W]hen state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law . . . as a matter of comity." *ACLU v. City of Florissant*, 186 F.3d 1095, 1098-99 (8th Cir. 1999) (internal quotations omitted).

Kemmer first brought this action in state court and the presence of the federal law claims allowed Defendants to remove it to this Court. Summary judgment has been granted on those

federal law claims. Plaintiff's remaining Minnesota law claims for sexual abuse against Defendant Beitel should be remanded to Minnesota District Court.

## IV. CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 13] is **GRANTED in part**, as described above. Plaintiff's remaining state law claims are **REMANDED** to Minnesota District Court, Ninth Judicial District, Beltrami County.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Dated: June 18, 2002